IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WILLIAM MARK MOORE,<br><br>Plaintiff,<br><br>v.<br><br>MC ARCHITECTS INC.; LITO T. PANIDA; and DOES 1 through 20,<br><br>Defendants. | CIV. NO. 24-00367 JMS-KJM<br><br>ORDER GRANTING DEFENDANTS' MOTION TO DISMISS, ECF NO. 30, WITH LEAVE TO AMEND |

### ORDER GRANTING DEFENDANTS' MOTION TO DISMISS, ECF NO. 30, WITH LEAVE TO AMEND

### I. INTRODUCTION

Before the court is Defendants MC Architects Inc. ("MCA") and Lito T. Panida's ("Panida") (collectively, "Defendants") Motion to Dismiss Count 1 of Plaintiff William Mark Moore's ("Moore") Complaint ("Motion to Dismiss"), ECF No. 30.  For the reasons that follow, the court GRANTS the Motion to Dismiss WITH LEAVE TO AMEND.

## II. BACKGROUND

A. **General Factual Background**[1]

This case arises from Moore's unsuccessful effort to open a brewery in the Kakaʻako neighborhood of Honolulu. ECF No. 1 at PageID.3. Moore leased a commercial warehouse space in Kakaʻako from the Howard Hughes Corporation ("HHC") and then retained MCA—a Honolulu architecture firm—for design services. *Id.* at PageID.3–5. Throughout the relevant time period, Panida represented MCA. *Id.* at PageID.4.[2] Moore informed Panida that his budget was $350,000. *Id.* Moore and MCA entered into a Design Agreement, Compl. Ex. A, ECF. No. 1-1 at PageID.26–27, under which Moore paid MCA $65,668 for the design services. ECF No. 1 at PageID.5.[3]

After the Design Agreement was executed, Panida told Moore that MCA "would need to inflate the proposed cost of [Moore's] buildout by $300,000"

---

[1] This summary of events is drawn from the factual allegations contained in the Complaint, ECF. No. 1 at PageID.3–17, which are taken as true at this motion-to-dismiss stage. *See, e.g., Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996).

[2] The Complaint does not clearly explain Panida's relationship with MCA, alleging only that he was "an agent and/or employee" of the firm. ECF No. 1 at PageID.4. At the hearing, Defendants confirmed that Panida was an employee of MCA throughout the relevant time period.

[3] The Complaint is inconsistent about the amount actually paid to MCA, at one point alleging that Moore paid $61,010 (the cost of the design services), *id.* at PageID.5, and at other points alleging that Moore paid $65,668 (the cost of the design services plus expenses and taxes). *Id.* at PageID.10, 20–23. The Complaint also does not clearly indicate whether the $65,668 was part of, or separate from, Moore's $350,000 budget.

2

because of "an unwritten 'pay to play' policy in the Victoria Ward / Kakaʻako neighborhood." *Id.* Panida explained that the cost increase would consist of $100,000 for demolition, $100,000 for air conditioning, and $100,000 for accessible restrooms. *Id.* at PageID.6–7. Panida told Moore that the inflated cost was necessary "'to ensure you get your brewery'" and "insisted that in the Victoria Ward area, 'everybody pays.'" *Id.* at PageID.6.

After drawing up the demolition plans, Panida told Moore that "there was 'a cost for doing business in Victoria Ward.'" *Id.* at PageID.7. Moore responded that he would do the demolition himself. *Id.* Panida initially told Moore that doing so would be illegal because a demolition permit was required. *Id.* But Panida abandoned that position after Moore instructed him to stop working until Moore could meet with HHC to discuss the issue. *Id.* at PageID.7–8. Moore ultimately found a contractor on his own and paid $11,600 for the demolition work. *Id.* at PageID.8. Panida "called the circumvention of the $100,000 fee a 'stunt' and informed [Moore] he would 'get it back as part of the finishings.'" *Id.*

Moore then told Panida that he would not pay the $100,000 fee for air conditioning, and began directly contacting air conditioning vendors. *Id.* Panida insisted that the choice of vendor "would be his and not [Moore's]," and "reiterated that the $100,000 'fee' [was] required and, without it, [Moore] 'wouldn't get his brewery.'" *Id.* at PageID.8–9. Moore responded that "if air

3

conditioning requires a $100,000 'fee,' then to remove the air conditioning" from the design. *Id.* at PageID.9. Panida countered that omitting air conditioning would violate Moore's lease. *Id.* Moore disputed that claim and produced a copy of the lease, but Panida "refused to remove the air conditioning" and told Moore that he would look for air conditioning vendors. *Id.*

Next, Moore told Panida that "if he continued to demand a $100,000 'fee'" for accessible restrooms, Moore would switch the brewery to a classification that would not allow on-site consumption and therefore would not require accessible restrooms. *Id.* Panida insisted that "'we are not switching'" the brewery's classification. *Id.*

Moore then told Panida that "he wanted out of his contract with [MCA] and wanted to hire a different architect." *Id.* at PageID.10. Panida said "that would be fine, however [MCA] would not refund" Moore's $65,668 payment and would not give him access to any design work that had been completed. *Id.* Panida also told Moore that "the same $300,000 'pay to play' fee would be required regardless of which architect [he] hired." *Id.* Moore said that other local brewery owners had told him they had not paid such a fee. *Id.* Panida responded that "'they aren't building in Victoria Ward.'" *Id.*

Moore did not back out of his contract with MCA, and after a "cooling-off period," he resumed discussions with Panida. *See id.* at PageID.10–

4

11. Panida "began visiting the brewery property almost daily and asked [Moore] to send him emails documenting each element of the brewery in detail," including drawings of "fermenters, floor drains, production areas, customer areas, materials, equipment, and everything else [Moore] could think of." *Id.* at PageID.11. Moore expressed concern that these features would push the project over budget, but Panida "instructed [Moore] to submit it all now" and said "'if bids come in too high, we can value engineer.'" *Id.* Moore complied, believing that "many of the expensive items" could be removed from the final drawings. *Id.*

Panida then asked Moore to "approve and sign off on all the finishings proposed by [MCA] during an impromptu meeting in a parking lot." *Id.* at PageID.12. Moore refused. *Id.* at PageID.13. Stephen Larson, a tenant coordinator at HHC and Panida's "friend," reviewed MCA's plans and "offered costly additions and alternative design suggestions." *Id.* Moore again "refused and did not acknowledge those costly additions." *Id.* Soon after, Panida presented Moore with permit applications. *Id.* Moore asked Panida to "slow down and explain what was happening," but "ultimately signed the permit applications upon repeated assurances" from Panida "'that this is how we get construction estimates' and 'if bids come in too high, we can value engineer.'" *Id.*

Around that time, Panida made a series of visits to Moore's home. *Id.* During those visits, Panida tried "to persuade [Moore] to accept the $650,000

buildout cost and come up with the $300,000 needed to execute the highly over-budget plans," including through a business loan, "'crowdfunding,'" and borrowing from relatives. *Id.* at PageID.13–14. Panida "continually repeated 'everybody pays' and 'if you don't come up with the money you won't get your brewery.'" *Id.* at PageID.14.

Bids were solicited from general contractors, and all bids "came back at $650,000 or more." *Id.* at PageID.14–15. Moore asked Panida to begin the "'value engineering,'" but Defendants "refused to reduce the scope of the project and said they could try a different contractor." *Id.* at PageID.15. A subsequent bid "came in well above" Moore's $350,000 budget, so he again requested that costs be reduced by changing the brewery's classification. *Id.* MCA again refused, so Moore "began trying to find alternatives to get the brewery built" by a contractor specializing in brewery construction. *Id.*

Panida then "engaged in direct communications with" HHC, "falsely claiming that [Moore] was unable to afford the brewery." *Id.* Moore's relationship with HHC "began unraveling," with Larson refusing to answer Moore's phone calls or respond to his emails. *Id.* HHC then notified Moore that it planned to redevelop the area that encompassed his leased space, so he "would need to find an alternative location for his brewery." *Id.* HHC said it would assist Moore "in relocating . . . to another of its properties" in accordance with the terms of his

6

lease. *Id.* at PageID.15–16. Moore was the only tenant to receive a redevelopment and relocation notice from HHC. *Id.* at PageID.16.

Moore then met with Kellie Forman, HHC's Executive Vice President of Leasing. *Id.* She told him that she had been contacted by Larson, who had informed her "about the pending redevelopment" and told her to contact Moore "to inform him that he could not go forward with his buildout." *Id.* Later, Moore met with Forman again and told her about the "'pay to play' scheme" and Larson's "refusal to work with" him. *Id.* She sent an email to connect Larson and Moore "'to verify some information relative to architect's fees,'" but Larson did not respond. *Id.* Larson was later terminated by HHC, and "HHC's senior counsel negotiated a non-disclosure agreement with [Moore's] attorney." *Id.*[4] Panida was also terminated by MCA. *Id.*

Moore "was ultimately unable to complete the buildout of his space or an alternative space offered by HHC," and his business "failed before it was ever launched." *Id.* at PageID.17.

**B.     Procedural Background**

The Complaint asserts three causes of action: (1) a claim under Hawaii's Racketeering Influenced and Corrupt Organizations (RICO) statute,

---

[4] The details of this non-disclosure agreement are not included in the Complaint.

Hawaii Revised Statutes ("HRS") ch. 842; (2) breach of contract; and (3) intentional misrepresentation. *Id.* at Page ID.17–23.

On August 8, 2025, Defendants filed a Motion to Dismiss Moore's RICO claim, arguing that the Complaint fails to state the claim with sufficient factual plausibility to satisfy Federal Rule of Civil Procedure 8(a)(2) and with sufficient particularity to satisfy Federal Rule of Civil Procedure 9(b). ECF No. 30. On August 29, 2025, Moore filed an Opposition to the Motion to Dismiss, ECF No. 32, and on September 8, 2025, Defendants filed a Reply. ECF No. 33. The court held a hearing on the Motion to Dismiss on September 22, 2025.

### III. STANDARDS OF REVIEW

Under Rule 8 of the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement" of each claim "showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To determine whether that requirement is satisfied, the court must set conclusory factual allegations aside, accept non-conclusory factual allegations as true, and determine whether these allegations state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–80 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202,

8

1216 (9th Cir. 2011); *see also Iqbal*, 556 U.S. at 678 (noting that Rule 8 does not require detailed factual allegations, but "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation[s]").

Claims sounding in fraud are subject to a heightened pleading standard under Federal Rule of Civil Procedure 9(b).[5] To satisfy the heightened standard, the complaint must "state with particularity the circumstances constituting" the fraud. Fed. R. Civ. P. 9(b). In other words, the complaint "must identify the who, what, when, where, and how" of the allegedly extortionate statements. *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 668 (9th Cir. 2019) (citations and quotation marks omitted).

## IV. ANALYSIS

### A. Failure to State a Claim

A claim under Hawaii's RICO statute has five elements: (1) conduct of (2) an enterprise (3) through an act (4) of racketeering activity that (5) caused

---

[5] The applicability of Rule 9(b) to a civil RICO claim depends on the nature of the underlying predicate act. For example, Rule 9(b) applies to civil RICO claims premised on a predicate act of mail fraud or wire fraud. *See, e.g.*, *Bolos v. Waldorf=Astoria Mgmt. LLC*, 762 F. Supp. 3d 975, 1011 (D. Haw. 2025). Rule 9(b) would also apply to a civil RICO claim premised on a predicate act of extortion involving fraudulent statements or omissions. In any case, in both their briefing and oral argument, the parties agree that Rule 9(b) applies to Moore's RICO claim. *See* ECF No. 30 at PageID.123–124; ECF No. 32 at PageID.136.

injury to the plaintiff's business or property. *Ryan v. Salisbury*, 380 F. Supp. 3d 1031, 1056 (D. Haw. 2019); *see also* HRS ch. 842.[6]

### 1.　*The Complaint Lacks Facts Showing That Defendants Caused Moore's Alleged Injury*

The injury-and-causation element of a civil RICO claim requires a showing that the plaintiff suffered harm to his business or property, *Glob. Master Int'l Grp., Inc. v. Esmond Nat., Inc.*, 76 F.4th 1266, 1271 (9th Cir. 2023), and that there was "a direct and proximate causal relationship between the asserted injury and the alleged misconduct." *Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*, 298 F.3d 768, 774 (9th Cir. 2002). The harm must be more than speculative; a plaintiff "must show that he has suffered a concrete financial loss." *Fireman's Fund Ins. Co. v. Stites*, 258 F.3d 1016, 1021 (9th Cir. 2001).

Here, Moore's alleged injuries include: (1) the loss of $343,421.97 invested in the brewery venture; (2) the "forfeiture" of the $65,668 paid to MCA for design services; and (3) the loss of future revenue and profits. ECF No. 1 at

---

[6] Hawaii's RICO statute parallels the federal RICO statute. *State v. Ontai*, 84 Haw. 56, 61, 929 P.2d 69, 74 (1996). Accordingly, the Hawaii Supreme Court and courts in this district have recognized that federal law is a useful aid in interpreting the state statute. *Id.*; *Ryan v. Salisbury*, 380 F. Supp. 3d 1031, 1056 (D. Haw. 2019).

PageID.20. At minimum, the loss of Moore's investment in the venture is cognizable under Hawaii's RICO statute.[7]

The alleged causal chain, however, is incomplete. The Complaint alleges that Defendants "caused" Moore's business to fail, resulting in the loss of his investment. *Id.* at PageID.19–20. But that statement is not enough on its own. *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *see also Hyun Ju Park v. City & County of Honolulu*, 292 F. Supp. 3d 1080, 1102 (D. Haw. 2018) (concluding that a similarly unsupported statement of causation was "conclusory and therefore insufficient to survive a motion to dismiss"). Moore's claim of causation must be supported by factual allegations showing *how* Defendants caused the venture to fail. *Twombly*, 550 U.S. at 555 (explaining that a plaintiff must plead facts sufficient "to raise a right to relief beyond the speculative level").

To be sure, the Complaint includes some allegations relevant to causation. For example, it alleges that after Moore refused to go along with the cost increases, Panida began meddling in Moore's relationship with HHC, and that soon after, HHC informed Moore that he would need to relocate. ECF No. 1 at

---

[7] As for the second alleged injury, the Complaint states that Moore agreed to pay MCA $65,668 under the Design Agreement, which was executed before the alleged racketeering activity occurred. *See* ECF No. 1 at PageID.5 (noting that Panida first mentioned the cost increases "[a]fter [Moore] accepted [MCA's design] proposal, [and] executed the Design Agreement"). So it appears doubtful that the loss of the $65,668 payment could constitute an injury for purposes of the RICO claim.

11

PageID.15. But the Complaint also acknowledges that HHC offered to assist in "relocating him to another of its properties" in accordance with the terms of his lease. *Id.* at PageID.15–16. The Complaint states that Moore "was ultimately unable to complete the buildout of . . . [the] alternative space offered by HHC," *id.* at PageID.17, but it makes no allegations directly tying that outcome to Defendants' actions. Because that gap breaks the causal chain, Moore's RICO claim as alleged must be dismissed. *See Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 12 (2010) ("[I]n the RICO context, the focus is on the directness of the relationship between the conduct and the harm.").

    **2.**    ***The Complaint Contains Additional Factual Gaps Relating to the Existence and Conduct of an "Enterprise"***

In addition to the injury-and-causation element, Moore must also allege facts showing that Defendants engaged in conduct of an enterprise. *Ryan*, 380 F. Supp. 3d at 1056. Under Hawaii's RICO statute, an "enterprise" includes "any sole proprietorship, partnership, corporation, association, and any union or group of individuals associated for a particular purpose although not a legal entity." HRS § 842-1.

A group "associated for a particular purpose although not a legal entity," *id.*, is also known as an "association-in-fact" enterprise. *State v. Park*, 149 Haw. 542, 547, 495 P.3d 392, 397 (Haw. App. 2021). An association-in-fact enterprise has three characteristics under Hawaii law: (1) "a common purpose";

(2) "continuity of structure and personnel"; and (3) "an ascertainable structure distinct from the racketeering activity." *State v. Ontai*, 84 Haw. 56, 63, 929 P.2d 69, 76 (Haw. 1996).[8]

The Complaint contains some allegations relating to these elements. For example, the Complaint alleges that:

- Panida was "an agent and/or employee" of MCA,

- Larson was Panida's "friend," and

---

[8] Moore argues that *Ontai*'s formulation of the third element is no longer valid because it rests on *United States v. Turkette*, 452 U.S. 576 (1981), which was "revisit[ed]" and "squarely rejected" by *Boyle v. United States*, 556 U.S. 938 (2009). ECF No. 32 at PageID.138. The court disagrees with Moore's assessment.

Federal courts sitting in diversity are "bound by state court interpretations of state law" except when "convinced by 'persuasive data that the highest court of the state would decide otherwise.'" *See N.H. Ins. Co. v. Vieira*, 930 F.2d 696, 701 (9th Cir. 1991) (quoting *West v. Am. Tel. & Tel. Co.*, 311 U.S. 233, 237 (1940)). Here, the court is not convinced that, if confronted with the issue today, the Hawaii Supreme Court would stray from *Ontai*'s formulation of the third element. The court reaches this conclusion for two reasons.

First, in holding that an enterprise must have a structure distinct from its racketeering activity, the Hawaii Supreme Court relied not only on *Turkette* and related federal case law, but also on independent state-law rationales. *See Ontai*, 84 Haw. at 63, 929 P.2d at 76. For example, the court explained that a failure to clearly define the enterprise element would "risk duplicating [Hawaii's] existing criminal statutes" because that element distinguishes the RICO statute from statutes establishing the underlying predicate offenses, accomplice liability, and conspiracy. *Id.* The court also noted that the federal statute requires a pattern of racketeering activity, whereas Hawaii's RICO statute requires only a single predicate act, so the enterprise element "becomes that much more important" under state law. *Id.*

Second, the court does not agree with Moore's assertion that the United States Supreme Court has "squarely rejected" *Turkette*'s formulation of the third element. ECF No. 32 at PageID.138. That assertion is based on *Boyle*, in which the Court acknowledged that the existence of an enterprise can sometimes be inferred from evidence of a pattern of racketeering activity. 556 U.S. at 947. But that acknowledgement is not inconsistent with *Turkette*. *See id.* ("We recognized in *Turkette* that the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'" (quoting *Turkette*, 452 U.S. at 583)). Moreover, the Court reiterated in *Boyle* that "the existence of an enterprise is an element distinct from the pattern of racketeering activity and 'proof of one does not necessarily establish the other.'" *Id.* (quoting *Turkette*, 452 U.S. at 583).

13

- MCA, Panida, and Larson "functioned as both a formal (MC Architects Inc.) and an informal organization and a continuing unit for the purpose of extorting $300,000" from Moore.[9]

ECF No. 1 at PageID.2, 13, 18.  The first two allegations must be taken as true, and provide some information about the alleged enterprise's structure and personnel.  But these allegations shed no light on whether the alleged enterprise had continuity and "structure distinct from" the alleged racketeering activity at issue here.  *Ontai*, 84 Haw. at 63, 929 P.2d at 76.  And although the third allegation suggests a common purpose of extorting Moore, it is largely a legal conclusion that must be supported by additional facts.  *See Papasan v. Allain*, 478 U.S. 265, 286 (1986) (noting that for purposes of a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation").  In short, more is needed to show that Defendants were part of an association-in-fact enterprise as opposed to an ad hoc group formed for the sole purpose of extorting Moore.

Assuming Moore can allege facts sufficient to show the existence of an enterprise, he must also allege facts showing that Defendants participated in the "conduct" of the enterprise, which requires participation "in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185

---

[9] Although the Complaint alleges that MCA is a Hawaii corporation, ECF No. 1 at PageID.2, and identifies MCA as a "formal . . . organization," *id.* at PageID.18, it does not appear to allege that MCA was itself the RICO enterprise.  Instead, Moore's RICO claim appears to be premised on the existence of an association-in-fact enterprise consisting of MCA, Panida, Larson, and "unknown others." *Id.* at PageID.17.

(1993). The Complaint alleges that Panida took actions to further the enterprise's alleged purpose (extortion), such as demanding inflated payments, suggesting that those payments would determine the fate of Moore's brewery venture, and insisting that "everybody pays." ECF No. 1 at PageID.6, 9, 14. The Complaint also alleges that Panida took these actions as "an agent and/or employee" of MCA. *Id.* at PageID.2. But although the Complaint implies that MCA approved of Panida's actions, it does not contain factual allegations supporting that conclusion. In short, more is needed to show that MCA participated in the "conduct" of the enterprise. *See Agena v. Cleaver-Brooks, Inc.*, 2019 WL 11248590, at * 15 (D. Haw. Oct. 31, 2019) (explaining that under Hawaii's RICO statute, "merely allowing" another party's activity does not amount to "conduct" of an enterprise).

### 3. The Complaint Adequately Pleads the Remaining Elements of a Civil RICO Claim

Finally, a civil RICO plaintiff must allege that the defendants engaged in an act of racketeering activity. *Ryan*, 380 F. Supp. 3d at 1056. Hawaii's RICO statute defines "racketeering activity" to include "any act or threat involving" various predicate acts, including "extortion." HRS § 842-1.[10] Under Hawaii law, extortion can be committed by (1) obtaining or exerting control over the property

---

[10] Attempted extortion appears to be Moore's only theory of racketeering activity. The court assumes for purposes of this Order that an unsuccessful extortion attempt could constitute an "act or threat *involving*" extortion. HRS § 842-1 (emphasis added); *see also* HRS § 705-500 (establishing an attempted criminal act as an inchoate crime). Defendants do not argue otherwise.

of another (2) with intent to deprive, (3) by threatening an act (4) that "would not in itself substantially benefit the defendant but that is calculated to harm substantially some person with respect to the threatened person's . . . business, calling, career, [or] financial condition."  HRS § 707-764(1)(l).  A plaintiff asserting a RICO claim based on a predicate act of extortion must plead each of these elements.  *See Nutrition Distrib. LLC v. Custom Nutraceuticals LLC*, 194 F. Supp. 3d 952, 957 (D. Ariz. 2016) (stating that a RICO plaintiff "must adequately plead the elements of each predicate act").

      The Complaint adequately pleads the elements of attempted extortion.  For example, it alleges that Defendants tried to obtain Moore's property by demanding $300,000 from him.  ECF No. 1 at PageID.17–18.  And it alleges that Panida told Moore that he "wouldn't get his brewery" if he refused to pay, *id.* at PageID.8, which would substantially harm Moore's business or financial condition without benefiting Defendants.  *See also id.* at PageID.14 ("[I]f you don't come up with the money you won't get your brewery.").

      The Complaint also alleges that Panida "threatened" that Moore "wouldn't get his brewery" if he didn't pay.  ECF No. 1 at PageID.8–9; *see also id.* at PageID.14 ("'[I]f you don't come up with the money you won't get your brewery.'").  Although the Complaint does not allege that Panida said explicitly that he or MCA would *cause* the venture to fail if Moore refused to pay, a threat

16

can be reasonably inferred from Panida's statements. *See Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1247–48 (9th Cir. 2013) (noting that reasonable inferences are drawn in the plaintiff's favor at the motion-to-dismiss stage).[11]

## B.     Leave to Amend

Leave to amend should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), and should be denied only where "the pleading could not possibly be cured by the allegation of other facts." *Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 960 (9th Cir. 2020) (internal quotation marks omitted) (quoting *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc)). In other words, leave to amend may be denied when amendment would be futile. *Carolina Cas. Ins. Co. v. Team Equip., Inc.*, 741 F.3d 1082, 1086 (9th Cir. 2014).

Here, additional factual allegations could bridge the gap in the causal chain and correct the deficiencies concerning the enterprise element of the RICO claim. Because the court "cannot say at this stage that . . . amendment would be futile," Moore is granted leave to file an amended complaint. *McGinn v. Haw. Symphony Orchestra*, 727 F. Supp. 3d 915, 933 (D. Haw. 2024).

---

[11] The Complaint does not allege that *MCA itself* played a role in the alleged threats. But if Moore files an amended complaint alleging additional facts relating to the enterprise element, those facts may also clarify MCA's possible involvement in the alleged threats.

## V. **CONCLUSION**

For the foregoing reasons, the court GRANTS Defendants' Motion to Dismiss, ECF No. 30, and DISMISSES Count 1 WITH LEAVE TO AMEND. Plaintiff may file an Amended Complaint by October 17, 2025. Any amendments must be limited to addressing the deficiencies identified in this Order, and may not introduce new claims or allege additional facts relating only to the other existing claims.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, September 26, 2025.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge