IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WILLIAM MARK MOORE,<br><br>Plaintiff,<br><br>v.<br><br>MC ARCHITECTS INC.; LITO T. PANIDA; and DOES 1 through 20,<br><br>Defendants. | CIV. NO. 24-00367 JMS-KJM<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' DISPOSITIVE MOTIONS, ECF NOS. 52, 54, 56 |

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' DISPOSITIVE MOTIONS, ECF NOS. 52, 54, 56**

## I. INTRODUCTION

This case arises from Plaintiff William Mark Moore's ("Moore")

effort to open a brewery in Honolulu.  As part of that effort, Moore executed a

contract with Defendant MC Architects Inc. ("MCA"), a local architecture firm.

The project failed before the brewery was built, and in the aftermath, Moore sued

MCA and Lito T. Panida ("Panida"), an MCA employee who had been Moore's

primary point of contact.

In the operative first amended complaint ("FAC"), Moore asserts

three causes of action:  (1) intentional misrepresentation; (2) breach of contract;

and (3) a claim under Hawaii's Racketeer Influenced and Corrupt Organizations

("RICO") statute, Hawaii Revised Statutes ("HRS") Chapter 842.  ECF No. 38 at

PageID.205–216.  Now pending before the court are three dispositive motions filed

by MCA and Panida (collectively, "Defendants"): (1) a motion to dismiss, or in the

alternative, for summary judgment on the civil RICO claim, ECF No. 56;

(2) a motion for summary judgment on the misrepresentation and breach-of-

contract claims, ECF No. 54; and (3) a motion for summary judgment on damages,

ECF No. 52.

For the reasons that follow, (1) the civil RICO claim is DISMISSED

WITHOUT LEAVE TO AMEND, (2) summary judgment is GRANTED on the

misrepresentation and breach-of-contract claims, and (3) summary judgment is

GRANTED IN PART AND DENIED IN PART as to damages.

## II.  <u>BACKGROUND</u>

### A.    **Factual Background[1]**

Moore came to Hawaii in 2018 to open a "one-of-a-kind brewery"

that would produce beer infused with "a native Hawaiian fruit known as the Akala

---

[1]  This summary of events is drawn from the factual allegations contained in the FAC.
*See* ECF No. 38 at PageID.190–205.  These allegations are taken as true only in determining
whether the civil RICO claim must be dismissed.  *See, e.g.*, *Nat'l Pork Producers Council v.
Ross*, 6 F.4th 1021, 1026 (9th Cir. 2021) ("At the motion to dismiss stage, we take as true the
facts plausibly alleged in the complaint.").  For purposes of the summary judgment motions, the

(continued . . . )

raspberry."  ECF No. 38 at PageID.190.  The first batch would not be fermented and ready for sale for two years, so controlling costs during this initial period was "essential" to the project's success.  *Id.*

In April 2019, Moore leased a "commercial warehouse property" in the Kakaʻako neighborhood of Honolulu from the Howard Hughes Corporation ("HHC").  *Id.* at PageID.191.  He then held on-site meetings with representatives of four architecture firms to discuss the brewery's design.  *Id.*  During these meetings, Moore "informed all four prospective architects that his budget was $350,000."  *Id.* at PageID.192.

One of the meetings was with Panida, who represented MCA.  *Id.* at PageID.191–192.  Shortly after the meeting, MCA "provided a written proposal . . . for the provision of architectural and engineering services" for the project.  *Id.* at PageID.192.  Moore accepted the proposal and paid MCA $65,668.  *Id.*[2]

---

allegations in the FAC are not taken as true; instead, the court looks to evidence in the record and resolves disputed facts in favor of the nonmoving party.  *See, e.g.*, *Leading Mfg. Sols., LP v. Hitco, Ltd.*, 2018 WL 1382791, at *2 (S.D. Cal. 2018) ("When ruling on a motion for summary judgment, the Court looks to evidence; mere allegations or arguments are not sufficient to withstand a motion for summary judgment."); *Walker v. Potter*, 629 F. Supp. 2d 1148, 1164 (D. Haw. 2009) ("In considering a motion for summary judgment, a court must resolve all disputed facts in favor of the non-moving party.").

[2]  The FAC is inconsistent about the amount actually paid to MCA, at one point alleging that Moore paid $61,010 (the cost of the design services), ECF No. 38 at PageID.192, and at other points alleging that Moore paid $65,668 (the cost of the design services plus expenses and taxes), *id.* at PageID.197, 213–215.

After the contract (the "Design Agreement") had been executed, Panida told Moore that MCA "would need to inflate the proposed cost of [Moore's] buildout by $300,000" because of "an unwritten 'pay to play' policy in the Victoria Ward / Kakaʻako neighborhood." *Id.* at PageID.192–193. Panida explained that the cost increase would consist of $100,000 for demolition, $100,000 for air conditioning, and $100,000 for accessible restrooms. *Id.* at PageID.193–194. Panida told Moore that the inflated cost was necessary "'to ensure you get your brewery'" and "insisted that in the Victoria Ward area, 'everybody pays.'" *Id.* at PageID.193.

After drawing up the demolition plans, Panida told Moore that "there was 'a cost for doing business in Victoria Ward.'" *Id.* at PageID.194. Moore responded that he would do the demolition himself. *Id.* Panida initially told Moore that doing so would be illegal because a demolition permit was required. *Id.* But Panida abandoned that position after Moore instructed him to stop working until Moore could meet with HHC to discuss the issue. *Id.* at PageID.194–195. Moore ultimately found a contractor on his own and paid $11,600 for the demolition work. *Id.* at PageID.195. Panida "called the circumvention of the $100,000 fee a 'stunt' and informed [Moore] he would 'get it back as part of the finishings.'" *Id.* at PageID.196.

Moore then told Panida that he would not pay the $100,000 fee for air conditioning, and began directly contacting air conditioning vendors. *Id.* Panida insisted that the choice of vendor "would be . . . his and not [Moore's]," and "reiterated that the $100,000 'fee' [was] required and, without it, [Moore] 'wouldn't get his brewery.'" *Id.* Moore responded that "if air conditioning requires a $100,000 'fee,' then to remove the air conditioning" from the design. *Id.* Panida countered that omitting air conditioning would violate Moore's lease. *Id.* Moore disputed that claim and produced a copy of the lease, but Panida "refused to remove the air conditioning" and told Moore that he would look for air conditioning vendors. *Id.* at PageID.196–197.

Next, Moore told Panida that if he "continued to demand a $100,000 'fee'" for accessible restrooms, Moore would switch the brewery to a classification that would not allow on-site consumption and therefore would not require accessible restrooms. *Id.* at PageID.197. Panida insisted that they would not be switching the brewery's classification. *Id.*

Moore then told Panida that "he wanted out of his contract with [MCA] and wished to hire a different architect." *Id.* Panida said "that would be fine, however [MCA] would not refund" Moore's $65,668 payment and would not give him access to any design work that had been completed. *Id.* Panida also told Moore that "the same $300,000 'pay to play' fee would be required regardless of

which architect [he] hired." *Id.* Moore said that other local brewery owners had told him they had not paid such a fee. *Id.* Panida responded that "'they aren't building in Victoria Ward.'" *Id.*

Moore did not back out of his contract with MCA, and after a "cooling-off period," he resumed discussions with Panida. *Id.* at PageID.198. Panida "promised that [MCA] would prepare drawings for permits in order to solicit construction bids and . . . obtain estimates." *Id.* Moore asked for "construction estimates prior to bids." *Id.* Panida told Moore that his request was "foolish," said that he "obviously did not understand how it works," and told him to "quit removing things . . . and get the drawings done." *Id.*

Panida then "began visiting the brewery property almost daily" and asked Moore to "send him emails documenting each element of the brewery in detail," including drawings of "fermenters, floor drains, production areas, customer areas, materials, equipment, and everything else [Moore] could think of." *Id.* Moore expressed concern that these features would push the project over budget, but Panida "instructed [Moore] to submit it all now" and said that if "'bids come in too high, we can value engineer.'" *Id.* at PageID.198–199. Moore complied, believing that "many of the expensive items" could be "removed from the final drawings." *Id.* at PageID.199.

Panida then asked Moore to "approve and sign off on all the finishings proposed by [MCA] during an impromptu meeting in a parking lot." *Id.* at PageID.200. Moore refused. *Id.* Stephen Larson, a tenant coordinator at HHC and Panida's "friend," reviewed MCA's plans and "offered costly additions and alternative design suggestions." *Id.* Moore again "refused and did not acknowledge those costly additions." *Id.*

Soon after, Panida presented Moore with permit applications to sign. *Id.* at PageID.201. Moore asked Panida to "slow down and explain what was happening," but "ultimately signed the permit applications upon repeated assurances" from Panida that "'this is how we get construction estimates' and 'if bids come in too high, we can value engineer.'" *Id.*

Around that time, Panida made a series of visits to Moore's home. *Id.* During those visits, Panida tried "to persuade [Moore] to accept the $650,000 buildout cost and come up with the $300,000 needed to execute the highly over-budget plans," including through a business loan, "'crowdfunding,'" and borrowing from relatives. *Id.* at PageID.201–202. Panida "continually repeated 'everybody pays' and 'if you don't come up with the money you won't get your brewery.'" *Id.* at PageID.202.

The permit drawings "were hastily submitted" to the local permitting agency "at the same time general contractor walk-throughs were occurring for the

7

purpose of soliciting bids." *Id.* All bids "came back at $650,000 or more." *Id.*
Moore then asked Panida to begin the "'value engineering,'" but Defendants "refused to reduce the scope of the project and said they could try a different contractor." *Id.* A subsequent bid "came in well above" Moore's $350,000 budget, so he again requested that costs be reduced by changing the brewery's classification. *Id.* at PageID.202–203. MCA again refused, so Moore "began trying to find alternatives to get the brewery built" by a contractor specializing in brewery construction. *Id.* at PageID.203.

Panida then "engaged in direct communications with" HHC, "falsely claiming that [Moore] was unable to afford the brewery." *Id.* Moore's relationship with HHC "began unraveling," with Larson refusing to answer Moore's phone calls or respond to his emails. *Id.* HHC then notified Moore that it planned to redevelop the area that encompassed his leased space, so he "would need to relocate." *Id.* Moore was the only tenant to receive a redevelopment and relocation notice from HHC. *Id.* at PageID.204.

Moore then met with Kellie Forman, HHC's Executive Vice President of Leasing. *Id.* at PageID.203. She told him that she had been contacted by Larson, who had "informed her that the building is pending redevelopment" and told her to tell Moore that he "could not go forward with his buildout." *Id.*

A few months later, Moore met with Forman again and told her about the "'pay-to-play' scheme" and Larson's "refusal to work with" him. *Id.* at PageID.204. She sent an email to connect Larson and Moore "'to verify some information relative to architect's fees,'" but Larson did not respond. *Id.* Larson was later terminated by HHC, and HHC "negotiated a non-disclosure agreement with [Moore's] attorney." *Id.*[3] Panida was also terminated by MCA. *Id.*

Moore "was ultimately unable to complete the buildout of his space or an alternative space offered by HHC," and his business "failed before it was ever launched." *Id.* at PageID.204–205.

## B. Procedural Background

Moore filed the FAC on October 17, 2025, ECF No. 38, and Defendants filed an Answer on October 31, 2025, ECF No. 39.[4] At the close of discovery on February 9, 2026, Defendants filed the three instant motions. ECF Nos. 52, 54, 56; *see also* ECF No. 42 (discovery deadline). Moore filed oppositions on March 16, 2026, ECF Nos. 60, 62, 64, and Defendants filed replies

---

[3] The details of this non-disclosure agreement are not included in the FAC.

[4] The FAC was filed after the court dismissed Moore's civil RICO claim as alleged in his original complaint for failure to state a claim. ECF No. 36 (dismissal order); *Moore v. MC Architects Inc., et al.*, 2025 WL 2754759 (D. Haw. Sept. 26, 2025). Moore had been granted leave to amend. *Id.*

on March 23, 2026, ECF Nos. 70, 71, 72.  The court held a hearing on the motions

on April 8, 2026.  *See* ECF No. 77.[5]

## III.  DISCUSSION

A.     **Motion to Dismiss—Civil RICO Claim**

1.     ***Standard of Review***

A complaint must contain "a short and plain statement" of each claim

"showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To

determine whether that requirement is satisfied, the court must set conclusory

factual allegations aside, accept non-conclusory factual allegations as true, and

determine whether these allegations state a plausible claim for relief.  *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 677–80 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007)).  The complaint "may not simply recite the elements of a cause of

action," and instead "must contain sufficient allegations of underlying facts to give

---

[5] Before the April 8, 2026 hearing, the court issued an order identifying a number of record- and case-citation issues in Moore's oppositions and directing Moore's counsel to be "prepared to explain these issues, and in particular, whether they resulted from the use of artificial intelligence ('AI') tools." ECF No. 75.  During the hearing, Moore's counsel explained that Moore (that is, the client) had taken a lead role in preparing the oppositions and had used AI tools in the process of doing so.  ECF No. 78 at PageID.1650.  Moore's counsel accepted full responsibility for the issues identified in the court's order and agreed to the court's proposed $1,000 sanction without the need for an order to show cause.  *Id.* at PageID.1651.

The court summarizes this aspect of the procedural history here to preface this Order's merits discussion.  Beyond the citation issues and record misrepresentations identified in the court's previous order, Moore's oppositions often stray beyond the scope of the claims alleged in the FAC, present digressive arguments in convoluted terms, and fail to provide citations to support assertions of fact and/or law.  The court has made its best effort to understand and thoroughly address Moore's arguments.

fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011); *see also Iqbal*, 556 U.S. at 678 (noting that Rule 8 does not require detailed factual allegations, but "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation").  When ruling on a motion to dismiss, the court considers only the complaint, attached exhibits, and documents incorporated by reference.  *See Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002).

### 2.      *Analysis—Civil RICO Claim*

A plaintiff asserting a civil RICO claim under Hawaii law must plausibly allege that the defendant engaged in (1) conduct of (2) an enterprise (3) through a predicate act (4) of racketeering activity that (5) caused injury to the plaintiff's business or property.  *Ryan v. Salisbury*, 380 F. Supp. 3d 1031, 1056 (D. Haw. 2019); *see also* HRS §§ 842-2(3), 842-8(c).

Here, the FAC alleges that Defendants and others "organized and conspired for a common purpose to extort" money from Moore by "threatening" that he "would not get his brewery" unless he "agreed to pay $300,000 in excess of the actual and budgeted cost of the project based on intentionally inflated false construction costs."  ECF No. 38 at PageID.206.

Defendants' motion argues that the FAC fails to plausibly allege three elements of the civil RICO claim:  (1) the existence of an enterprise;

(2) Defendants' participation in its conduct; and (3) a causal connection to Moore's injuries.  ECF No. 56 at PageID.849.

>    a.    *Existence of an enterprise*

The FAC alleges that Defendants were part of an "association-in-fact" enterprise.  *See* ECF No. 38 at PageID.206 ("The Enterprise, composed of both defendants and non-defendant participants acting in coordination, was an association-in-fact . . . ."); *see also* HRS § 842-1 (defining "enterprise" as including "any union or group of individuals associated for a particular purpose although not a legal entity"); *State v. Park*, 149 Haw. 542, 547, 495 P.3d 392, 397 (Haw. Ct. App. 2021) (using term "associated-in-fact enterprise").

An association-in-fact enterprise must have "continuity of structure and personnel."  *State v. Ontai*, 84 Haw. 56, 63, 929 P.2d 69, 76 (1996). "Continuity of structure is shown by 'an organizational pattern or system of authority that provides a mechanism for directing the group's affairs on a continuing, rather than ad hoc, basis.'"  *Id.* (quoting *United States v. Kragness*, 830 F.2d 842, 856 (8th Cir. 1987)).  "Continuity of personnel is shown by 'associational ties among the individuals that amount to an organizational pattern or system of authority.'"  *Id.* (quoting *Kragness*, 830 F.2d at 856) (brackets omitted).

The FAC alleges that the enterprise existed from 2019 through 2021 and "operated as a continuing unit through multiple related projects in the Victoria Ward / Kakaʻako neighborhood," and that Panida, Larson, and a third-party permit expediter named Corey Schmidt ("Schmidt") "had collaborated on prior projects over an extended period." ECF No. 38 at PageID.207. But because the FAC does not allege any substantiating facts, it fails to carry these allegations "across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570, and therefore does not show continuity.[6]

An association-in-fact enterprise must also have an "ascertainable structure distinct from the racketeering activity." *Ontai*, 84 Haw. at 64, 929 P.2d at 77. To determine whether this element is satisfied, Hawaii courts set aside "evidence of the predicate acts of racketeering" and ask "if there is still evidence of other legal or illegal acts that show an ongoing organization." *Id.* (citing *United States v. Lemm*, 680 F.2d 1193, 1201 (8th Cir. 1982)).

---

[6] Defendants argue that the FAC fails to plead continuity with the specificity required by Federal Rule of Civil Procedure 9(b). ECF No. 56 at PageID.860. But Rule 9(b)'s heightened pleading standard applies only to the predicate act element of a civil RICO claim, and only where the alleged predicate act would trigger the heightened standard if it were a standalone claim. *See Nutrition Distrib. LLC v. Custom Nutraceuticals LLC*, 194 F. Supp. 3d 952, 957 (D. Ariz. 2016) (analyzing claim under federal RICO statute and stating that the plaintiff "must adequately plead the elements of each predicate act, satisfying the pleading standard that would apply if the predicate act were a stand-alone claim").

The FAC alleges that the enterprise included Defendants and "non-defendant participants acting in coordination" and occupying "interlocking roles," and that each participant was "indispensable" to the enterprise's operation.  ECF No 38 at PageID.188, 206–07.  These allegations, even if not set aside as conclusory, shed no light on the *structure* of the alleged enterprise.

Other allegations in the FAC are indistinguishable from the alleged extortion scheme and must be set aside.  *See Ontai*, 84 Haw. at 64, 929 P.2d at 77.  For example, the FAC alleges that:

- the "acts of extortion" were committed by Defendants, Larson, Schmidt, HHC, and unknown others "acting in concert and through their respective agents";

- Defendants and Larson "organized and conspired" to extort money from Moore; and

- "without the architect's license, the unlicensed operator, the permit expeditor, and the landlord's control, the scheme could not succeed."

ECF No. 38 at PageID.206–07.  Because these allegations are "drawn entirely from the predicate act" of extortion, they indicate "nothing about any organization beyond" that act and are insufficient to show a "structure *distinct from* the racketeering activity."  *Ontai*, 84 Haw. at 64, 929 P.2d at 77 (emphasis added).

Finally, the FAC alleges that the enterprise "possessed . . . relationships (license → execution → landlord → permitting → concealment)."  ECF No. 38 at PageID.207.  Again, even if this vague allegation is not set aside as

14

conclusory, it must be set aside as indistinguishable from the predicate act. Although the connection is not made explicit, these alleged "relationships" map closely onto the facts of the alleged extortion scheme against Moore, and the FAC does not allege that the relationships existed before or persisted after.

In sum, the FAC fails to plausibly allege two essential characteristics of an association-in-fact enterprise.[7] Moore's opposition does not meaningfully contest this conclusion. *See* ECF No. 64 at PageID.1257 (arguing without elaboration that the FAC alleges "common purpose; continuity of structure; continuity of personnel; and distinct structure").

b.    *Conduct of an enterprise*

Even if the FAC had adequately pled the existence of an enterprise, it fails to plead that Defendants participated in the conduct of an enterprise. This element requires that a defendant "had some part in directing" the enterprise's affairs. *Park*, 149 Haw. at 551, 495 P.3d at 401. Mere participation in predicate acts of racketeering activity is insufficient, *id.* at 550, 495 P.3d 401, and that is all that the FAC alleges here.

For example, the FAC alleges the following actions by Defendant MCA, through its principal Steven Marlette:

---

[7] An association-in-fact enterprise must also have a "common purpose." *Ontai*, 84 Haw. at 63, 929 P.2d at 76. Defendants do not argue that the FAC fails to plead this element.

- providing "the professional licensure, insurance, and signature authority that enabled Defendant Panida's unlawful architectural practice"; and

- stamping, authenticating, and submitting a permit application package that contained "falsified government documents."

ECF No. 38 at PageID.207–208.  Similarly, the FAC alleges that Panida "executed the extortion scheme" by:

- "demanding three separate overpayments of $100,000";

- "expand[ing] the project scope to embed the same $300,000 in unapproved 'finishings'";

- "bypass[ing] the contractually required estimating phase to prevent disclosure of the inflated costs";

- "working with" Schmidt and Larson to "submit falsified permit filings to the City and County of Honolulu"; and

- "coordinat[ing] with" HHC and Larson to "initiate[] lease recapture."

*Id.* at PageID.208–209.

In short, although the FAC alleges a variety of actions by both Defendants, all relate to the extortion scheme itself.  As a result, the FAC fails to adequately allege that either Defendant participated in "the operation or management" of a broader enterprise.  *Reeves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (quoted with approval in *Park*, 149 Haw. at 550, 495 P.3d at 400); *see also Park*, 149 Haw. at 550, 495 P.3d at 400 (concluding that engaging in three acts of prostitution did not amount to participation in the conduct of a brothel enterprise).

> c.    *Causation*

Finally, a plaintiff asserting a civil RICO claim must allege "'a direct and proximate causal relationship between the asserted injury and the alleged misconduct.'" *Moore v. MC Architects Inc., et al.*, 2025 WL 2754759, at *4 (D. Haw. Sept. 26, 2025) (quoting *Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*, 298 F.3d 768, 744 (9th Cir. 2002)).  The FAC fails to do so.

The FAC alleges that after Moore's working relationship with Defendants had started to deteriorate, Panida engaged in "direct communications" with HHC and "falsely claim[ed]" that Moore was "unable to afford the brewery." ECF No. 38 at PageID.203.  The implication seems to be that these communications caused Moore's relationship with HHC to "unravel[]," *id.*, and prompted the company to single him out for relocation to a different space, *see id.* at PageID.204 (alleging that Moore "was the only tenant in the HHC industrial warehouse complex who was given notice of an imminent demolition and redevelopment and told to prepare to relocate").  Based on these alleged facts, the FAC asserts that Defendants "orchestrat[ed] lease recapture," "terminated"

Moore's tenancy, and "extinguished his ongoing business opportunity."  *Id*. at

PageID.212.[8]

Like the original complaint, the FAC leaps from Moore being "told to

prepare to relocate" to him being "ultimately unable to complete the buildout"—

including in an "alternative space" offered by HHC.  *Id.* at PageID.204; *see also*

*Moore*, 2025 WL 2754759, at *4 ("The Complaint states that Moore 'was

ultimately unable to complete the buildout of . . . [the] alternative space offered by

HHC,' . . . but it makes no allegations directly tying that outcome to Defendants'

actions.") (brackets and first ellipsis in original).  Even assuming that Defendants

*did* cause HHC to relocate Moore, the FAC fails to explain how Defendants'

conduct prevented him from moving forward with the project in the alternative

space.  Again, "that gap breaks the causal chain."  *Id.*[9]

---

[8]  The FAC also alleges that:  (1) each predicate act "was a substantial factor in, and the direct and foreseeable cause of" Moore's injuries; (2) Moore was unable to complete the buildout of the brewery "due to" Defendants' conduct; and (3) "as a result" of Defendants' conduct, the project "failed before it was ever launched."  ECF No. 38 at PageID.204–205, 212.  These conclusory allegations need not be taken as true.  *See Papasan v. Allain*, 478 U.S. 265, 286 (1986) (stating that for purposes of a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation").

[9]  In addition, the FAC alleges that Defendants "coerc[ed]" Moore into signing a nondisclosure agreement with HHC, ECF No. 38 at PageID.212, but does not provide any additional facts to make that claim plausible, as opposed to merely conceivable, *see Twombly*, 550 U.S. at 570.  Moreover, the FAC does not allege that the nondisclosure agreement itself somehow constituted a cognizable injury to Moore's "business or property."  HRS § 842-8(c) ("Any person *injured in the person's business or property* by reason of a violation of this chapter may sue therefor . . . .") (emphasis added).

* * *

The court's previous order identified multiple gaps in Moore's civil RICO claim as alleged in his original complaint.  *See Moore*, 2025 WL 2754759, at \*4–5.  Because these gaps have not been significantly narrowed, the court concludes that further amendment would be futile.  *See Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 960 (9th Cir. 2020) (stating that leave to amend may be denied when "the pleading could not possibly be cured by the allegation of other facts") (quoting *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc)).  Accordingly, Moore's civil RICO claim is DISMISSED WITHOUT LEAVE TO AMEND.

**B.    Motions for Summary Judgment—Misrepresentation Claim, Breach-of-Contract Claim, and Damages**

   *1.    Standard of Review*

Summary judgment is proper when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  An issue is "genuine" only if there is "a sufficient evidentiary basis on which a reasonable factfinder could find for the nonmoving party," and a fact is "material" only if it "could affect the outcome of the suit under the governing law," *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48 (1986)).

The party moving for summary judgment bears the initial burden of proving the absence of a genuine issue of material fact. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). If the moving party carries its burden, the nonmoving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis omitted). The nonmoving party must show more than "some metaphysical doubt as to the material facts," *id.* at 586, and must identify more than "the mere existence of a scintilla of evidence" in its favor, *In re Oracle*, 627 F.3d at 387; *see also Liberty Lobby*, 477 U.S. at 248 (stating that a party opposing summary judgment cannot "rest upon the mere allegations or denials of his pleading").

When considering a motion for summary judgment, the court "does not make credibility determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Instead, the court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Conclusory statements and speculation, however, are not sufficient to defeat a motion for summary judgment. *Thornhill Pub. Co., Inc. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

### 2. *Analysis—Intentional Misrepresentation Claim*

Under Hawaii law, an intentional misrepresentation claim requires (1) a false representation (2) made with knowledge of its falsity and (3) in contemplation of the plaintiff's reliance, and (4) the plaintiff's detrimental reliance. *See Preez v. Banis*, 2015 WL 415890, at *10 (D. Haw. Jan. 30, 2015) (citing *Miyashiro v. Roehrig, Roehrig, Wilson & Hara*, 122 Haw. 461, 482–83, 228 P.3d 341, 362–63 (Haw. Ct. App. 2010)).

Here, Moore's misrepresentation claim is based on Defendants' "representations made in and with respect to the Design Agreement promising to provide design, permitting, and related services . . . in exchange for payment" of $65,668. ECF No. 38 at PageID.215. Moore argues that Defendants knew these representations were false because MCA "would not actually provide any such services" unless Moore "later agreed to falsely inflate the scope of the project to include a hidden additional $300,000 to cover an undisclosed 'pay-to-play' fee." *Id.* Moore alleges that he relied on Defendants' misrepresentations to his detriment when he "agreed to hire Defendant MCA, executed the Design Agreement, and paid" the $65,668 contract price. *Id.*

Defendants argue they are entitled to summary judgment because Moore's misrepresentation claim is based on promissory statements, which generally cannot give rise to a misrepresentation claim. ECF No. 54 at

21

PageID.558–561; *Shoppe v. Gucci America, Inc.*, 94 Haw. 368, 386, 14 P.3d 1049, 1067 (2000) (stating that "an actionable representation cannot consist of mere broken promises . . . even if there is no excuse for failure to keep the promise, and even though a party acted in reliance on such promise"). But Hawaii law recognizes an exception: A broken promise *is* actionable as a misrepresentation if the promise was made without an intent to fulfill it. *Haw. Cmty. Fed. Credit Union v. Keka*, 94 Haw. 213, 230, 11 P.3d 1, 18 (2000).

Moore's opposition argues that his claim is not based solely on promissory statements, but also on "representations about existing, present facts." ECF No. 62 at PageID.1201. Moore points to four statements:

- Panida's "repeated[] assert[ion] . . . that ADA-compliant restrooms were required" under state regulations, and Panida's submission of a regulatory document to Moore as "proof" of that requirement;

- Panida's statement to Schmidt that the project's "new improvement" value was $255,000;

- Panida's statements to Moore that certain aspects of the project had been removed from the permit drawings as requested; and

- MCA's inclusion of the $255,000 "new improvement" value on permit application documents.

*Id.* at PageID.1203–1206.

As an initial matter, the court concludes that these four statements fall outside the scope of Moore's misrepresentation claim as alleged in the FAC.

Specifically, the FAC alleges that Defendants' misrepresentations induced Moore

to hire MCA, execute the Design Agreement, and pay the $65,668 contract price.

*See* ECF No. 38 at PageID.215.[10]  Given that allegation, Defendants would have

understood the claim to be based on statements made *before* Moore took those

actions—after all, actions cannot be taken in reliance on statements not yet made.

As a result, Defendants could not have anticipated that the claim

might also be based on the four statements at issue here, which were made *after*

Moore hired MCA, executed the contract, and made the payment—and are now

being "presented for the first time in . . . opposition to summary judgment."

*Pickern v. Pier 1 Imports (U.S.) Inc.*, 457 F.3d 963, 969 (9th Cir. 2006).  Because

Defendants were not given "adequate notice of these new allegations," Moore

cannot rely on them to defeat summary judgment.  *Id.* at 968–69 (affirming

summary judgment under similar circumstances); *Twombly*, 550 U.S. at 555

(stating that a complaint must "give the defendant fair notice of what the . . . claim

is and the grounds upon which it rests") (citation and quotation marks omitted).

Of course, these four statements could be considered in determining

whether a genuine issue of fact exists regarding the intent behind Defendants'

---

[10]  The FAC's allegation of reliance reads, in full:  "[Moore] reasonably relied upon Defendant MCA and Defendant Panida's false material misrepresentations in and relating to the Design Agreement to [his] detriment when he agreed to hire Defendant MCA, executed the Design Agreement, and paid Defendant MCA $65,668.00."  ECF No. 38 at PageID.215.

"promis[es] to provide design, permitting, and related services," which are the

basis of the claim as alleged in the FAC.  ECF No. 38 at PageID.215.  As

previously explained, those promises could give rise to a misrepresentation claim if

Defendants did not intend to perform unless Moore gave in to the alleged "pay-to-

play" scheme.  The four statements at issue here could be relevant to Defendants'

intent.  But Moore's opposition does not argue that the "no-intent-to-perform"

exception applies, and as a result, this argument is waived.  *See, e.g., Schrader v.

Wynn Las Vegas, LLC*, 2020 WL 8513790, at *2 (D. Nev. Dec. 9, 2020) (citing

*Maves v. First Horizon Home Loans*, 461 F. App'x 636, 638 (9th Cir. 2011)) ("The

Court cannot manufacture arguments for litigants; arguments that are not

developed are waived.").[11]

In sum, (1) the misrepresentation claim as alleged in the FAC is based

on promissory statements, (2) promissory statements generally cannot give rise to a

misrepresentation claim, and (3) Moore has not argued that the "no-intent-to-

perform" exception applies.  Accordingly, summary judgment for Defendants on

Moore's misrepresentation claim is GRANTED.

---

[11]  Although the FAC alleges that Defendants knew they "would not actually provide any
. . . services" unless Moore gave into the "pay-to-play" scheme, ECF No. 38 at PageID.215,
"[a]llegations alone cannot defeat a motion for summary judgment." *Fawkner v. Atlantis
Submarines, Inc.*, 135 F. Supp. 2d 1127, 1133 (D. Haw. 2001).

### 3.    *Analysis—Breach of Contract Claim*

Under Hawaii law, a plaintiff asserting a breach-of-contract claim must establish:  (1) the existence of a contract; (2) the parties to the contract; (3) that the plaintiff performed under the contract; (4) the particular provision or provisions breached by the defendant; and (5) when and how the breach occurred. *Honold v. Deutsche Bank Nat. Tr. Co.*, 2010 WL 5174383, at *3 (D. Haw. Dec. 15, 2010); *see also Otani v. State Farm Fire & Cas. Co.*, 927 F. Supp. 1330, 1335 (D. Haw. 1996) (stating that the claim must "cite the contractual provision allegedly violated" and "[g]eneralized allegations of a contractual breach are not sufficient"), *aff'd in part and rev'd in part*, 117 F.3d 1425 (9th Cir 1997) (applying same principles but holding that the complaint "was sufficient to give . . . notice of the specific breach alleged"); *see also Au v. Au*, 63 Haw. 210, 221, 626 P.2d 173, 181 (1981) (affirming dismissal of claim for failure to "specify what provisions of the agreement . . . were breached").

Here, Moore's breach-of-contract claim is based on MCA's alleged failure to "complete project designs in accordance with [Moore's] specifications and within the terms of his $350,000 budget" and to perform "related services as agreed" in the Design Agreement.  ECF No. 38 at PageID.214.  Defendants argue that no provision of the Design Agreement required MCA to "prepare a design in accordance with any particular specifications or budget."  ECF No. 54 at

PageID.564.  Moore responds that his claim "does not rest solely on an implied cost-control obligation," but also on express terms in the Design Agreement and related "project documents."  ECF No. 62 at PageID.1208.

These arguments require the court to apply Hawaii law regarding contract interpretation, which the court outlines before analyzing the arguments.

> a.      *Contract interpretation under Hawaii law*

Contract terms are "interpreted according to their plain, ordinary, and accepted sense in common speech."  *Am. Sav. Bank, F.S.B. v. Chan*, 2019 WL 3385930, at *4 (Haw. Ct. App. Jul. 26, 2019).  But contract terms are not read in isolation; instead, a contract "should be construed as a whole and its meaning determined from the entire context and not from any particular word, phrase, or clause."  *Santiago v. Tanaka*, 137 Haw. 137, 155, 366 P.3d 612, 630 (2016).

A contract term is ambiguous "only if it is capable of being reasonably understood in more than one way."  *Wittig v. Allianz, A.G.*, 112 Haw. 195, 201, 145 P.3d 738, 744 (Haw. Ct. App. 2006).  Mere disagreement between the parties regarding the meaning of a contract term "'does not render clear language ambiguous.'"  *Stanford Carr Dev. Corp. v. Unity House, Inc.*, 111 Haw. 286, 298, 141 P.3d 459, 471 (2006) (quoting *Found. Int'l, Inc. v. E.T. Ige Constr., Inc.*, 102 Haw. 487, 497, 78 P.3d 23, 33 (2003)).  "'Nor does ambiguity exist where one party's view strains the contract language beyond its reasonable and

ordinary meaning.'"  *Wittig*, 112 Haw. at 201–02, 145 P.3d at 744–45 (quoting

*Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992)).  In

addition, ambiguity must arise from the contract itself, not from extrinsic sources.

*Hawaiian Ass'n of Seventh-Day Adventists v. Wong*, 130 Haw. 36, 45, 305 P.3d

452, 461 (2013) ("As a general rule, the court will look no further than the four

corners of the contract to determine whether an ambiguity exists.").

The interpretation of a contract is a question of law, *Chan*, 2019 WL

3385930, at *4, as is the "threshold question" of whether a contract term is

ambiguous, *Wittig*, 112 Haw. at 201, 145 P.3d at 744.  But where an ambiguity

exists, it "raises the question of the parties' intent, which is a question of fact that

will often render summary judgment inappropriate."  *Id.*

> b.      *Application to the Design Agreement*

Moore's opposition concedes that the Design Agreement's "written

contract terms" did not require MCA to prepare a design within his budget.  *See*

ECF No. 62 at PageID.1213 (summarizing Defendants' argument and conceding

that it is "narrowly accurate as to the written contract terms").  Nevertheless, he

argues that MCA breached "written, express obligations" in the Design Agreement and related "project documents," *id*. at PageID.1208, citing three items.[12]

### i.    "Support owner during Bidding"

Moore first cites the language "support Owner during Bidding," which appears three times in the Design Agreement. *See* ECF No. 66-1 at PageID.1299.[13] He argues that the word "support" is ambiguous, and that "at minimum" these provisions required MCA to "respond constructively" when Moore "request[ed] scope reduction" after contractor bids came in above his budget. ECF No. 62 at PageID.1209. In other words, Moore interprets these provisions as requiring MCA to modify the completed project designs with the goal of reducing construction costs and soliciting a fresh round of bids.

Moore's interpretation is unreasonable. The ordinary meaning of "support" as used in this context is to "assist" or "help." *Support*, Merriam-Webster, https://www.merriam-webster.com/dictionary/support

---

[12] These three items appear to elaborate upon the FAC's allegation that Defendants failed to perform "related services as agreed" in the Design Agreement, ECF No. 38 at PageID.214, which is the kind of generalized allegation that Hawaii courts have considered insufficient to state a breach of contract claim. But because Defendants have not raised this issue or requested dismissal on this basis, the court considers these items under the summary judgment standard.

In addition, because these three items relate to the FAC's allegation that Defendants failed to perform "related services as agreed," *id.*, they do fall within the scope of Moore's claim—in contrast with the statements he cites in opposition to summary judgment on his misrepresentation claim.

[13] In one instance, the word "support" is capitalized, but this variation makes no difference in the court's analysis.

[https://perma.cc/NGE9-F4Q7].  Given that ordinary meaning, these provisions required MCA to "assist" or "help" Moore during the bidding process—and nothing more.[14]  The far more expansive reading that Moore advocates—interpreting "support . . . during Bidding" to include potentially extensive post-bidding redesign work—would "strain[] the contract language beyond its reasonable and ordinary meaning."  *Wittig*, 112 Haw. at 201–02, 145 P.3d at 744–45 (quoting *Seiden Assocs.*, 959 F.2d at 428).  Because Moore's interpretation is unreasonable, it does not reveal an ambiguity in the Design Agreement, and therefore fails to show a genuine issue of fact to avoid summary judgment.

> *ii.*     "'Third party review' permit processing services.  (direct contract to owner)"

Next, Moore points to an item under the "Exclusions" section of the Design Agreement that states:  "'Third party review' permit processing services.  (direct contract to owner)."  ECF No. 66-1 at PageID.1299.  Although Moore fails to explain how this provision should be interpreted, *see* ECF No. 62 at PageID.1212–1213, he nonetheless argues that it was breached when Panida engaged Schmidt without prior approval and then relegated Moore to a background role in the Schmidt relationship, *id.* at PageID.1212 (asserting that Panida

---

[14]  Moore does not argue that MCA failed altogether to assist or help him during the bidding process.  That is, he does not dispute that MCA fulfilled this interpretation of the provision, which is consistent with its "plain, ordinary, and accepted sense in common speech." *Am. Sav. Bank, F.S.B. v. Chan*, 2019 WL 3385930, at *4 (Haw. Ct. App. Jul. 26, 2019).

"engaged permit expediter Corey Schmidt and his firm . . . without Plaintiff's knowledge" and later "controlled the entire Schmidt relationship").

The court views this provision in context and considers its relationship with the Design Agreement as a whole. *See Santiago*, 137 Haw. at 155, 366 P.3d at 630. From this broader context, the court makes three observations.

First, the "Exclusions" section includes three other enumerated items:

- "Special Inspections as required by the County";

- "Board of water supply & Health Department review fees. Wastewater fees"; and

- "HDCA review & Building permit fees."

ECF No. 66-1 at PageID.1299. Each of these items refers to services performed by, or fees paid to, outside entities. With that commonality in mind, the provision at issue here is most naturally read as establishing that an outside entity—not MCA—would be paid to perform third-party review permit processing services. *See Fed. Ins. Co. v. Hawaiian Elec. Indus., Inc.*, 1997 WL 35428196 (D. Haw. Dec. 23, 1997) (explaining and applying the *noscitur a sociss* canon of construction, which "provides that the meaning of words may be determined by reference to their relationship with other associated words and phrases") (citations and quotation marks omitted).

Second, the "Exclusions" section appears immediately after three sections listing various services that MCA would provide, organized under the headings "Architectural," "Mechanical Engineering," and "Electrical Engineering." *Id.* This sequencing reinforces the interpretation that the provision at issue here served only to exclude third-party review from MCA's scope of work.

Third, the "Exclusions" section is followed by a "Compensation summary," which lists MCA's compensation for each of the three categories of services outlined earlier in the Design Agreement. *Id.* at PageID.1300. In addition, this section states that MCA's total compensation would include "reimbursable expenses," estimated at $600 "for printing." *Id.* Notably, this section also includes an estimate of "plan review fees for 'Third Party Review'"— but these fees *are not* mentioned as part of MCA's total compensation. *Id.*

In sum, when read in context, the provision at issue here establishes that (1) MCA would not provide, pay for, or receive compensation for third-party review services, and (2) such services would instead be separately retained through "direct contract to Owner." *Id.* at PageID.1299. In other words, this provision *does not* govern how a third-party reviewer would be selected, or what roles MCA and Moore would play in managing that relationship. Given this unambiguous meaning, none of the conduct described in Moore's opposition constitutes a

breach.[15]  In fact, Moore appears to concede that this provision was not breached, stating that Schmidt's company "billed [Moore] directly for its services separately from MC Architects."  ECF No. 62 at PageID.1212.

Even under a more expansive interpretation of this provision—which, again, is not expressly stated anywhere in Moore's opposition—the evidence shows that no breach occurred.  For example, Moore argues that MCA breached this provision by "engag[ing] . . . Schmidt without owner consent."  *Id*. at PageID.1213.  The record, however, shows that Moore was not cut out of the selection process.  Specifically, when Moore asked Panida why Schmidt had been chosen, Panida responded:  "We us[e] Corey [Schmidt] for majority if [sic] our project's [sic] and he's pretty reasonable.  If you have another company in mind let me know and [we] will ask for their service agreement proposals."  ECF No. 66-34 at PageID.1395.  Panida then asked if Moore wanted to use a different permit expeditor, likely at a higher rate.  *Id.* at PageID.1396.  Moore responded, "I never said that."  *Id.*

---

[15]  The court deliberately uses the word "described" here— as opposed to "cited" or "discussed"—because this section of Moore's opposition is almost entirely devoid of citations to the record.  *See* ECF No. 62 at PageID.1212–1213.  "At the summary judgment stage, [parties] must link their arguments to specific evidence in the factual record."  *Krizek v. Queens Med. Ctr.*, 2021 WL 2115428, at *7 n.8 (D. Haw. May 25, 2021) (citing *In re Caneva*, 550 F.3d 755, 761 (9th Cir. 2008)).

Given these conclusions, Moore has not identified a genuine issue of material fact to avoid summary judgment. *See, e.g.*, *Honold*, 2010 WL 5174383, at *3 (stating that the "basic elements of a breach of contract claim" include "when and how" the breach occurred); *Brodheim v. Cry*, 584 F.3d 1262, 1269 n.3 (9th Cir. 2009) (stating that to avoid summary judgment, a plaintiff "must demonstrate there is a triable issue of material fact on each element of his claim").

> ### iii. "BIDDING/ESTIMATING" language in MCA's "Preliminary Project Schedule"

Finally, Moore points to a "Preliminary Project Schedule" ("Project Schedule") that includes a heading titled "BIDDING/ESTIMATING." ECF No. 66-4 at PageID.1306.[16] Moore's argument seems to be that this language obligated MCA to conduct an "estimating phase" and provide a "cost estimate" before submitting the permit application to the local permitting agency. *See* ECF No. 62 at PageID.1212 ("No estimating phase was ever conducted. Plaintiff was never provided with a cost estimate. The permit set was submitted . . . without an estimating phase having occurred.").

---

[16] Moore's opposition asserts that the Project Schedule was delivered to him "the day after contract execution." *See* ECF No. 62 at PageID.1196. The cited evidence does not establish this fact, but Defendants do not dispute it.

Even assuming that the Project Schedule can be considered,[17] Moore's

interpretation of the "BIDDING/ESTIMATING" heading is unreasonable.  Again,

the meaning of this language must be "determined from the entire context."

*Santiago*, 137 Haw. at 155, 366 P.3d at 630.  Here, the relevant context includes

not only the Project Schedule as a whole, but also the underlying Design

Agreement.  In the Project Schedule, the heading "BIDDING/ESTIMATING" is

followed by a single task:  "Bidding."  ECF No. 66-4 at PageID.1306.  The

inclusion of that task is consistent with the Design Agreement, which states in

three places that MCA would "support [Moore] during Bidding."  *See* ECF No. 66-

1 at PageID.1299.  Likewise, the *absence* of "estimating"-related tasks in the

---

[17] The parties dispute whether the Design Agreement is "incomplete," and if so, whether that would open the door to consideration of the Project Schedule.  Hawaii case law is somewhat inconsistent on the latter question.  On one hand, the Hawaii Supreme Court has suggested that an incomplete contract—one that is not "certain and definite as to its essential terms"—is unenforceable.  *Moloaa Farms LLC v. Green Energy Team, LLC*, 157 Haw. 175, 188, 575 P.3d 808, 821 (2025) (quoting *Boteilho v. Boteilho*, 58 Haw. 40, 42, 564 P.2d 144, 146 (1977)) (quotation marks omitted).  On the other hand, the Hawaii Supreme Court has said that courts may "consider extrinsic evidence when the [contract] in question is ambiguous *or incomplete*," *Hawaiian Ass'n of Seventh-Day Adventists v. Wong*, 130 Haw. 36, 45, 305 P.3d 452, 462 (2013) (emphasis added), suggesting that incompleteness may not always render a contract unenforceable.  The key distinction may be whether the contract is incomplete with respect to essential terms (in which case it is unenforceable) or non-essential terms (in which case it remains enforceable and extrinsic evidence may be considered).  In any event, the court need not decide whether the Project Schedule can be considered, because Moore's interpretation of the language at issue is unreasonable.

Moore also argues that the Project Schedule is "not extrinsic at all in the legally meaningful sense" because it is a "post-execution operational document defining the scope of MC Architects' performance under the agreement."  ECF No. 62 at PageID.1211.  Hawaii case law forecloses this argument.  *See, e.g.*, *Hokama v. Relinc Corp.*, 57 Haw. 470, 476, 559 P.2d 279, 283 (1977) (defining "extrinsic evidence" as "all evidence outside of the writing").

Project Schedule is consistent with that word's absence from the Design

Agreement.  *See* ECF No. 66-1; ECF No. 66-4 at PageID.1306.

In sum, the heading "BIDDING/ESTIMATING"—the sole reference

to "estimating" anywhere in the Project Schedule and Design Agreement—cannot

be reasonably interpreted as requiring MCA to conduct an "estimating phase" and

provide a "cost estimate."  ECF No. 62 at PageID.1212.  Once again, because

Moore's interpretation is unreasonable, it fails to show an ambiguity that might

preclude summary judgment.

\* \* \*

Moore's opposition concedes that the "written contract terms" did not

require MCA to prepare a design within his budget, *id.* at PageID.1213,[18] and he

has not shown a genuine issue of fact regarding the meaning of the Design

---

[18] Notwithstanding this concession, Moore's opposition argues that "three separate bodies of evidence" show that MCA was obligated to prepare a design within his budget.  ECF No. 62 at PageID.1213.  But these "bodies of evidence" are extrinsic material, and as such, they can be considered only if the Design Agreement is itself ambiguous; they cannot *create* the ambiguity (or, in Moore's words, "create genuine disputes" about the meaning of the Design Agreement).  *Id.*; *Wong*, 130 Haw. at 45, 305 P.3d at 461 ("As a general rule, the court will look no further than the four corners of the contract to determine whether an ambiguity exists.").  Moore has not identified an ambiguity in the Design Agreement that would open the door to consideration of this extrinsic material.  *See* ECF No. 62 at PageID.1213–1215.

Agreement or whether any of its provisions were breached.  Accordingly, summary

judgment for Defendants on Moore's breach-of-contract claim is GRANTED.[19]

### 4.   Damages

Defendants also request summary judgment on two damages issues.

*See* ECF No. 52.  First, Defendants argue that the Design Agreement contains an

enforceable limitation-of-liability provision that restricts Moore's potential

recovery to "the total fee for services rendered on the project."  *Id.* at PageID.280.

Second, Defendants argue that Moore lacks evidence to establish lost future profits

with reasonable certainty as required under Hawaii law.  *Id.* at PageID.283.

Because this Order resolves all three claims in Defendants' favor,

these damages issues are moot.  *See, e.g.*, *Klamath-Lake Pharm. Ass'n v. Klamath*

*Med. Serv. Bureau*, 701 F.2d 1276, 1293 (9th Cir. 1983) (stating that a plaintiff

"does not have compensable damages unless it proves its case").  But to provide

clarity to the parties, the court will rule on the issue relating to lost future profits.

Under Hawaii law, "damages for lost profits are measured by the loss

of net profits, meaning net earnings or the excess of returns over expenditures."

*See Omura v. Am. River Invs.*, 78 Haw. 416, 418, 894 P.2d 113, 115 (Haw. Ct.

---

[19]  The FAC also alleges that MCA "breached . . . the implied covenant of good faith and
fair dealing."  ECF No. 38 at PageID.214.  But beyond this conclusory allegation, Moore has not
developed this theory of liability, and the court therefore deems it waived.  *See, e.g.*, *Williams v.
Rodriguez*, 2017 WL 511858, at *9 (E.D. Cal. Feb. 8, 2017) ("Undeveloped arguments that are
only argued in passing or made through bare, unsupported assertions are deemed waived.").

App. 1995) (quoting *Graphic Directions, Inc. v. Bush*, 862 P.2d 1024, 1024 (Colo. Ct. App. 1993)) (brackets and quotation marks omitted).  Future profits from a "new or unestablished business" must be shown with "reasonable certainty." *Chung v. Kaonohi Ctr. Co.*, 62 Haw. 594, 606, 618 P.2d 283, 291 (1980). "[A]bsolute certainty" is not required, and the evidence needed "depends on the circumstances of each individual case."  *Id.*

On the expenditures side of the equation, Moore's opposition argues that the general contractor bids "establish with reasonable certainty the range of construction costs."  ECF No. 60 at PageID.1170.  Even if that is true, Moore has not identified any evidence of his projected operating expenses, which are an essential variable in calculating lost profits.  *See, e.g.*, *In re Maui Agric. Co.*, 34 Haw. 566, 580 (1938) ("To arrive at net income from sales of goods, wares and merchandise there must also be deducted from gross sales the various expenses of operation, maintenance and administration.").

On the revenue side, Moore has identified no competent evidence at all.  His opposition concedes that the "revenue side is not yet quantified," but argues that "the record establishes its foundation."  ECF No. 60 at PageID.1170. He refers to his "brewery configuration . . . including specific fermenter specifications," and argues that a "net profit calculation based on the permitted configuration . . . is a defined, calculable analysis."  *Id.* at PageID.1170–1171.  But

37

facts about the brewery configuration reveal nothing about the customer traffic or sales volumes that could reasonably be expected.  Hawaii law might permit those figures to be inferred from, for example, the traffic and sales volumes of similar breweries or similarly sized businesses in Kakaʻako, but Moore has identified no such evidence.  The evidence that he *has* identified sheds essentially no light on his anticipated revenues, and falls far short of satisfying the reasonable certainty standard.

Given this lack of evidence, summary judgment for Defendants is GRANTED with respect to lost future profits.  Summary judgment is DENIED AS MOOT with respect to the limitation-of-liability provision.

## C.      Request for Relief Under Rule 56(d)

Finally, Moore requests relief under Federal Rule of Civil Procedure 56(d).  *See id*. at PageID.1172–1174; ECF No. 62 at PageID.1219–1222; ECF No. 64 at PageID.1260–1261.  Rule 56(d) provides that where a party opposing summary judgment "shows by declaration or affidavit that, for specified reasons, it cannot present facts essential to justify its opposition," the court may "defer considering the motion or deny it," "allow time to obtain affidavits or declarations or to take discovery," or provide other appropriate relief.  The party requesting relief under Rule 56(d) must "proffer sufficient facts to show that the evidence

sought exists, and that it would prevent summary judgment." *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1161 n.6 (9th Cir. 2001).

Moore's declaration in support of his request identifies five categories of evidence withheld by Defendants in discovery:

- "native design files" prepared by MCA for the project;

- "internal emails and communications" between Panida and Schmidt;

- "emails and communications" between Panida and Larson;

- MCA's internal records "concerning authority, supervision, and licensing related to the project"; and

- MCA's "billing records, fee records, and invoices reflecting what services were actually rendered on the project."

ECF No. 66 at PageID.1291–1293.

The cited material would not "prevent summary judgment," *Chance*, 242 F.3d at 1161 n.6, because it is not relevant to the court's rulings on Moore's claims. The court is granting summary judgment on his misrepresentation claim because it is based on promissory statements that are not actionable as misrepresentations, and he has not argued that an exception applies. Those conclusions involve pure questions of law, and therefore would not be affected by additional evidence. The same is true of the court's grant of summary judgment on Moore's breach-of-contract claim based on the unambiguous meaning of the Design Agreement—again, a question of law. And finally, the court is not

39

addressing summary judgment at all on Moore's civil RICO claim, and is instead

dismissing the claim based on pleading deficiencies.  Additional evidence would

not alter the conclusion that the FAC fails to state a plausible claim for relief.

The fifth category of material—MCA's billing records, fee records,

and invoices—relates to Defendants' request for summary judgment regarding the

limitation-of-liability provision of the Design Agreement.  Because that request is

denied as moot, that aspect of Moore's request for relief is also moot.

In sum, Moore's request for relief under Rule 56(d) is DENIED.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, (1) Moore's civil RICO claim is

DISMISSED WITHOUT LEAVE TO AMEND, (2) summary judgment is

GRANTED on Moore's misrepresentation and breach-of-contract claims, and

(3) summary judgment is GRANTED IN PART AND DENIED IN PART AS

MOOT as to damages.  The Clerk of Court shall close the case.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, May 5, 2026.



   /s/ J. Michael Seabright
J. Michael Seabright
United States District Judge